And our last case for argument this morning is Wince v. Hernandez. Ms. Frederick, good morning. Good morning, Your Honor. May it please the Court, my name is Calvita Frederick, and I represent Sylvester Wince in this matter against CBRE and other individual renamed defendants. Two issues are present on this appeal. Did the District Court err in granting summary judgment, and did the District Court err in granting defendants partial motion to dismiss? Both issues turn on the presentation of sufficient evidence such that a reasonable jury could return a verdict in favor of the non-moving party. In reviewing the evidence, the Court, as you know, must view the facts in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. We don't believe the District Court did that. Further, the non-moving party has the burden of establishing that there is no genuine issue of material fact. I'm sorry, the moving party has that burden. Defendants herein have not done that. When considering summary judgment on a race discrimination claim under Title VII and Section 1981, the sole question is whether or not plaintiffs submitted enough evidence that would permit a reasonable jury to conclude that plaintiff's race, sex, or other protected characterization caused the adverse employment action. All evidence belongs in a single pile. Right. So let me just jump in because time is short, unfortunately. Yes, ma'am. Let's talk for a minute about the two promotions to Assistant Chief Engineer and to Chief Engineer that Mr. Wentz indicated his interest in and moved along somewhere in the process but, in the end, didn't actually get the award of the jobs. And I want to know, you know, what's your best evidence that the real reason for that, that a rational jury could find that the reason for his failure to get those positions was his race, not just the fact that they decided that somebody else was preferable, better qualified? Yes. I appreciate that question. The fact is the educational background that Mr. Wentz had, as opposed to Mr. Bronniak, who was promoted over him. Mr. Bronniak did not have a college degree. Well, absolutely right. But was that educational background a pertinent qualification for the job? And, you know, were they exactly comparable in all other ways? No, they were not. I thought Mr. Bronniak had considerably more experience, for example, than Mr. Wentz. Mr. Bronniak did not have any experience. As near as I recall, he had experience on the chillers, but he did not have experience at all on the boilers and certain of the other equipment and relied on Mr. Wentz to help him when there were issues with that equipment that he had no experience on. But he'd already been in this hierarchy an assistant chief engineer apprentice, right? He was promoted to that position, again, in a situation where Mr. Wentz had applied and was the best candidate based on education and experience, and not just college education, but the types of certifications that Mr. Wentz had that Mr. Bronniak did not have. Did Mr. Wentz ever hold a position above that of lead engineer before he left this company? Not at CBRE. The minute he left, he was hired as a chief in several other locations. So he did have the qualifications, and our position is but for race. He should have been promoted to that position at CBRE. Did he ever apply? I mean, there was this chain, right? Did he ever apply for a lead engineer position? He applied for every position that came up while he was there. In the face of competing evidence, it's not the district court's job at the summary judgment level to weigh the evidence. But we have a special line of cases that deals with situations in which the employer, if you're going through the McDonnell Douglas approach, the employer says my nondiscriminatory reason for preferring, let's say, Bronniak over Mr. Wentz is because I thought Bronniak was better qualified. And we've said you have to be careful about that because we aren't in this line of business. And if the differences in qualifications are a matter of judgment, we would defer to an employer's assessment of that. But there has to be a pretty glaring difference before. That's the Mill case. Pretty glaring difference before we'll second guess that. And we say we're not a super personnel department and things like that. Sure. And that's legitimate, but where one person doesn't have the certifications and the experience to work on a certain kind of equipment that is crucial to the operation of the hospital buildings, and that's something that you don't get into at the summary judgment level in examining the factual basis for saying that one person is more qualified than the other. But to just blanketly say we chose Mr. Bronniak because he was more qualified, well, based on what? And that was not there. And Mr. Wentz submits that there were a whole bunch of reasons why he was not equally but better qualified for the position than was Mr. Bronniak. This court did improperly weigh the evidence and found that there was insufficient evidence by which a jury could find that race influenced the defendant's adverse employment actions. In so doing, the court overlooked the uncontroverted evidence that was before it. The plaintiff had discussed his concerns of unfair treatment as part of an investigation of another employee's discrimination charges, that he had filed several grievances, that he had called the ethics hotline to complain. He was openly told he wasn't liked and there was no future for him. There were racial slurs written on his lunchbox. He was consistently referred to by a demeaning nickname that he didn't like and asked them to stop. He was required, demanded to fix kitchen equipment that was not a part of what he did and for which he was not familiar. And then when he refused to do it, he was disciplined where his working on that equipment would have put himself, the equipment, and the facility in danger. And again, we've already talked about Bronniak, so I won't bring that up again. The above could reasonably be interpreted by a jury to reach the inference about whether or not defendants acted with a discriminatory intent with regard to plaintiff's adverse actions. May I reserve the rest of my time? Yes, you may. Thank you. Mr. Yingling, good morning. May it please the court, Patrick Yingling for CBRE and the individual defendant at Belize. Plaintiff contends there is sufficient evidence of discrimination. However, in the argument of the brief, not once does plaintiff cite record evidence and explain why it amounts to discrimination. Now, to be clear, though, this is not a mere briefing deficiency issue for plaintiff. The fact is, as the district court acknowledged, plaintiff attributes many work-related issues to discrimination. But after a close look at the record, the evidence simply isn't there. Now, while plaintiff did attribute many work-related incidents to discrimination in the district court, plaintiff's appeal is more limited. In the argument, plaintiff mentions only two alleged adverse actions, a decision not to promote and an alleged constructive discharge. Now, on promotion, we heard a little bit from counsel already. Plaintiff focuses on the fact that CBRE hired Andrew Brodniak to an assistant chief engineer position over plaintiff. Brodniak, however, held a higher position than plaintiff when applying for this job. The hierarchy of positions in the facilities department goes from chief engineer at the top down to assistant chief engineer, down to lead engineer, down to stationary engineer, which was plaintiff's position. Brodniak already was serving in an assistant chief engineer position, seeking a lateral move to another assistant chief engineer position, whereas plaintiff was a stationary engineer, seeking a promotion two steps above the level that he was currently at. As the district court put it, plaintiff wanted to skip a few spots in line, and the people who did get the promotions didn't jump the line. Now, we heard a little bit from counsel on this. Plaintiff alleges that, in contrast to himself, Brodniak lacked a college degree and lacked project manager certification. But the record actually doesn't support these statements. Specifically, nowhere in the record does it state that plaintiff had a project manager certification. And, in fact, the record makes it clear that he did not, that he took one class towards this project manager certification. This is the University of Chicago course. This is the University of Chicago course, right. So plaintiff did not have that certification. Brodniak, however, as we know from the record, had certifications in air conditioning, refrigerating and heating, boiler operations, refrigerant transition and recovery, refrigerant light commercial certification, and a Chicago stationary engineer's license. So can I ask, though, I mean, if we step back, kind of in the spirit of Ortiz, and we try to look at this evidence as a whole, there's some very troubling information in this record, whether it's these slurs on the lunchbox, or whether it's comments about, you know, not belonging here, work assignments. Why doesn't this lead, as we might have in the past said, under some more direct method, to a situation which a rational trier, in fact, could find if there was discrimination? Your Honor, I'll address the slurs on the tool chest first. There is an allegation that someone, an unknown person in 2016 or 2017, wrote a racist remark on plaintiff's tool chest, sometimes called his lunchbox in the record. And I'm certainly not dismissing the seriousness of that allegation. But it is undisputed that plaintiff does not even attempt to tie that to an alleged adverse action, as he would need to do to advance a claim here. And nor could he, because it is also undisputed that plaintiff never informed anyone at CBRE that this had taken place. This is not a situation in which an employer knew of harassment that was taking place and just simply turned its head to it. As the district court put it, there is no evidence that the company tolerated any such behavior. And when I think, when we're considering the Ortiz standard and everything together, I still think we need to focus on the fact that we need an adverse action here. We need something that plaintiff can point to to say race discrimination was the reason for this happening. And as far as the appellant's brief is concerned, only the decision not to promote and the alleged constructive discharge would potentially go to that. And if I may, for the court, discuss the constructive discharge situation. Plaintiff alleges that this can serve as the adverse action. But CBRE never discharged plaintiff, constructively or otherwise. Plaintiff voluntarily left CBRE in 2019, October of 2019, because he found a higher role position at TL Services. During his deposition, plaintiff stated that he took a new job with TL Services because, quote, I just received a higher level of what I was doing, meaning that I was in a high role position. Now, plaintiff points to a 2018 conversation that he had with Ernie Piers of CBRE, where Piers told plaintiff that the company didn't have leadership positions currently available and that plaintiff might look outside the company if he was interested in a leadership position. However, as the district court acknowledged, Piers' statement is not evidence of imminent termination, as would be needed for constructive discharge. Instead, it's evidence that plaintiff, if he wanted a leadership position, would have to look outside of the company in the near term for a promotion. And moreover, I think it's important to note that Piers then encouraged plaintiff to take this course at the University of Chicago, this project manager certification course. And then when plaintiff requested paid time off for that course, Piers expressly wrote to HR and stated, I am a big supporter in folks seeking further training in education and would like to try to accommodate this request. Excuse me. Just while we're on the course, did CBRE pay for or reimburse Mr. Wentz for that class at the University of Chicago? They did, Your Honor, and that's in the record, and that was a basis for the district court finding that tuition reimbursement was not an issue as far as this case is concerned. So what's this business about overtime then? Because there's some huge discrepancy between the number of hours that your evidence indicates he was offered and the number of hours he in fact took. Right. So I think my first point with respect to overtime, Your Honor, is that's never developed as an argument for reversal in this case. But beyond that, there is, of course, the record evidence that CBRE offered plaintiff. Was that 830 hours? Yeah, 830 hours. I think that was the number of available hours potentially he could take, and he accepted only 56 of those hours. But I think the real crux of it is that he identifies eight instances in which he was denied an overtime day but somebody else, a white employee perhaps, was given overtime. But he provides no evidence for us to determine whether that person is a comparator, whether that person was of higher seniority or lower seniority, for us to make the determination that that could be a relevant adverse action in this case. Did the plaintiff lodge any complaints in real time with CBRE? Because it seems like if you wanted to pursue overtime and you were denied it once, you might say, I don't know why I was denied it, and then you were denied it twice, you would start to complain at some point. Like, why is everybody else getting overtime and I'm not? What I know from the record as far as plaintiff's complaints, one complaint back in 2013 or 2014 that related to somebody else's race discrimination complaints where somebody else had a complaint against CBRE and he was interviewed as part of that and he made it clear to someone that he thought that perhaps there was race discrimination. And then later, at an unknown time, he called the ethics hotline, or at least this is his allegation to say that he thought there was race discrimination going on. But we don't know from the record any more than that, specifically what he was talking about, what specific action led to his thought that there was race discrimination. Do you know that it, does the record tell us that it relates to the overtime as opposed to the holiday issue or the other issues? My understanding is that there is, with respect to overtime specifically, that with his call to the ethics hotline, it was not related to overtime. I don't think there's anything in the record that would support that in particular. I can see that I'm short on time. I would ask that the court affirm the decision of the district court to grant summary judgment to CBRE and the individual defendants. Thank you. Ms. Frederick, you have two minutes. Yes. I did not get to the issue of the evaluation or the denial or the granting of the motion to dismiss with regard to the collective bargaining agreement. And once again, the question, that issue turned on whether or not the collective bargaining agreement needed to be interpreted, and it did not. The plain meaning of the words did not require interpretation. The CBA set forth what seniority meant and such. So there was no requirement for interpretation, and there was also the issue of whether or not plaintiff had submitted sufficient facts. We believe, again, that's a question for the jury, sufficient facts to support his allegation that the union did not properly represent him. With regard to what my colleague has stated, there were more than two alleged adverse actions. There was failure to promote. There was constructive discharge. There was also denial of overtime opportunities and denial of holiday time off. The record is replete with many, many e-mails where Mr. Wentz in real time repeatedly complained and questioned why other people were chosen for other time over him, especially people who had less seniority and less time on the job. They chose people who were not even in line for overtime to give that, as opposed to Mr. Wentz. The constructive discharge, he did not lead to get a higher job. The complaint and the evidence clearly shows that he became concerned for his safety. He was being required to fix equipment he didn't know anything about, which was dangerous to him and the equipment and the facility, as I said before. He was being disciplined. He was told that there was no future for him there. There were many reasons why he felt that the environment was hostile. If you look at constructive discharge through the hostile work environment analysis, and he also felt that termination was imminent. CBRE did not pay, did not reimburse for the project management position. Northwestern paid some money, and the need for overtime was the issue regarding Mr. Wentz's ability to continue with the project management classes. He couldn't afford it without the overtime. And it's interesting to note that CBRE chose to pay full tuition for certain other employees. They had that option. They never did that. Ms. Frederick, your time has expired. Thank you. You have wrapped up now. Thank you very much. You're welcome. All right. Our thanks to both counsel, all counsel. The case is taken under advisement, and that concludes today's calendar. The court is in recess.